GARY M. RESTAINO
United States Attorney
District of Arizona
GORDON E. DAVENPORT III
ANSHUL KRISHN
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: gordon.davenport.iii@usdoj.gov
       anshul.krishn@usdoj.gov
Attorneys for Plaintiff

FILED
2024 DEC -4 PM 1:42
CLERK US DISTRICT COURT
DISTRICT OF ARIZONA

CR24-08599 TUC-RM(JR)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | **INDICTMENT** |
|---|---|
| Plaintiff, | Violations: |
| vs. | 18 U.S.C. § 1349 (Conspiracy to Commit Honest Services Wire Fraud) Count 1 |
| Jorge Jimenez, | |
| Defendant. | |

**THE GRAND JURY CHARGES:**

At all times material to this Indictment, unless otherwise stated:

**Introductory Allegations**

1. Defendant JORGE JIMENEZ was a uniformed United States Border Patrol Agent since 2010. During the times material to this indictment, JIMENEZ was assigned, as part of his regular duties, to work at the Interstate-19 ("I-19") Checkpoint, near Amado in the District of Arizona.

2. Person A, at all times relevant to the conspiracy, was located in Mexico. They cannot legally enter the United States. Person A is related to JIMENEZ by marriage.

3. Person B, at all times relevant to the conspiracy, was located in Mexico. They cannot enter the United States legally and do not have a valid visa.

4. As a part of his duties at the I-19 Checkpoint, JIMENEZ would conduct immigration checks of people in vehicles traveling north. To conduct the checks, JIMENEZ would be assigned to one of three inspection lanes. JIMENEZ would briefly stop passing vehicles, conduct a verbal immigration check of the vehicles' occupants, and visually check for contraband in the vehicles. Border Patrol agents working the primary lane of the I-19 Checkpoint used their discretion in determining whether to refer a vehicle to secondary inspection for additional review.

5. Border Patrol, as an entity of the Department of Homeland Security, Customs and Border Protection, articulates its mission as "Protect the American people, safeguard our borders, and enhance the nation's economic prosperity." Two of its "Enduring Mission Priorities" is "**Secure the Border** – Protect the Homeland through the air, land and maritime environments against illegal entry, illicit activity or other threats to uphold national sovereignty and promote national and economic security[]" and "**Combat Transnational Crime** – Detect, deter and disrupt transnational organized crime that threatens U.S. national and economic security interests at and beyond the border."

6. Pursuant to federal law, all United States Border Patrol agents are required to take the following oath or affirmation upon assuming office: ""I, _____, do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties of the office on which I am about to enter. So help me God." JIMENEZ took his oath of office in 2010.

7. As a sworn Border Patrol agent, JIMENEZ owed a fiduciary duty to Border Patrol and the citizens of the United States to "well and faithfully discharge" the duties of the office of a Border Patrol agent free from corrupt influence.

## COUNT ONE
## 18 U.S.C. § 1349
### (Conspiracy to Commit Honest Services Wire Fraud)

8. The introductory allegations in paragraphs 1 through 7 are re-alleged and incorporated by reference in Count One.

### The Conspiracy and Bribery Scheme

9. Beginning from a time unknown, but at least including or about July 2024, and continuing into on or about October 2024, in the District of Arizona, the defendant, JORGE JIMENEZ, knowingly and intentionally combined, conspired, confederated, and agreed with Person A, Person B, and others known and unknown to the Grand Jury, to devise and intend to devise a scheme and artifice to defraud and deprive the citizens of the United States of their right to the honest services of JIMENEZ, a sworn U.S. Border Patrol agent, by means of transmissions of wire and radio communications in interstate and foreign commerce, in violation of 18 U.S.C. §§ 1343, 1346, and 1349.

### The Purpose of the Conspiracy and Bribery Scheme

10. The purpose of the conspiracy and bribery scheme was for JIMENEZ, Person A, and Person B to unlawfully benefit and enrich themselves through accepting monetary bribes in exchange for JIMENEZ not inspecting or referring certain vehicles that passed his though inspection lane while he was on duty, working as a Border Patrol agent at the I-19 Checkpoint.

### The Manner and Means of the Conspiracy and Bribery Scheme

11. The manner and means by which JIMENEZ, Person A, and Person B carried out the conspiracy and bribery scheme included, but were not limited to, the following:

12. Person A and Person B (collectively the "coordinators") were in Mexico. An individual seeking to smuggle illegal narcotics through the I-19 Checkpoint would approach them in Mexico or contact them electronically and they would act as a go-

between, facilitating and coordinating with JIMENEZ and the narcotics smugglers for the purposes of scheduling the passing of narcotics loads through the I-19 Checkpoint at a time and through the lane when JIMENEZ would be working and could "waive through" the narcotics load without inspection. The coordinators also facilitated the collection of the payment for that service. The coordinators would then divide the proceeds between themselves and JIMENEZ.

13. To ensure the narcotics loads could successfully pass through the I-19 Checkpoint without inspection, JIMENEZ would undermine Border Patrol's efforts at narcotics interdiction by providing his coordinators with the dates he was on duty, notice of the times he was working the primary inspection lane, and what lane he was assigned. He would also provide real time updates of information relevant to a smuggler such as when the canine inspectors were on breaks. When previously designated vehicles approached his lane, he would waive them through without inspection.

14. During the time alleged, the conspiracy received more than $40,000. JIMENEZ's portion of the proceeds was represented at $400/kg of narcotics for a total of approximately $25,000 during the time relevant to this indictment.

15. JIMENEZ and his co-conspirators for the purpose of and as an essential part of executing the scheme to defraud caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signals, and sounds: to wit they used telephones to communicate about the conspiracy, including communications that resulted in interstate wire transmissions.

16. JIMENEZ and his co-conspirators used code to describe a narcotic pass-through event. Generally, they would refer to the narcotic pass-through event as playing basketball. Certain narcotics also were identified in code, for example "quesitos" was identified code for a kilogram of cocaine.

17. JIMENEZ attempted to conceal the conspiracy and bribery scheme by deleting his messages with Persons A relating to the relevant time.

**Overt Acts of the Conspiracy and Bribery Scheme**

18. In furtherance of the conspiracy and bribery scheme, and to accomplish their purposes, JIMENEZ, Person A, Person B, and their co-conspirators, engaged in and caused one or more of the following overt acts in the District of Arizona and elsewhere:

19. On July 16, 2024, Person B engaged in a telephonic voice conversation over WhatsApp with putative narcotics coordinator[1] (PNC). During the conversation Person B represented JIMENEZ could assist in smuggling narcotics through the I-19 Checkpoint while on duty and Person B informed PNC that JIMENEZ was scheduled to work Wednesday through Sunday from 2:00 p.m. to 11:00p.m.

During the call, Person B outlined the scheme as this: at the beginning of the JIMENEZ's shift, JIMENEZ would provide the coordinators with the specific inspection lane he/she[2] wants the driver to use to transport the narcotics. Further, Person B explained that a visible item would need to be placed on the vehicle's dashboard, so JIMENEZ could easily identify the correct vehicle to pass through when it came through his lane. Person B gave the example of a Phoenix Suns hat being visible in the vehicle's dashboard. Person B mentioned how JIMENEZ may conduct a routine inspection, before allowing the driver and vehicle to continue past the I-19 Checkpoint.

20. On July 19, 2024, Person B engaged in a telephonic voice conversation over WhatsApp with the PNC. During the call, the PNC asked for prices to transport cocaine from Nogales to Tucson, Arizona. The PNC and Person B agreed that a fair price for passage would be $700 per kilogram of cocaine, with JIMENEZ receiving $400 per kilogram. The PNC offered to allow JIMENEZ to inspect the load of narcotics prior to transport to confirm amount. Person B represented JIMENEZ did not want to personally see the narcotics.

21. On July 19, 2024, Person B engaged in a telephonic voice conversation over WhatsApp with the PNC. The PNC confirmed his/her associates were ready to smuggle

---

[1] All conversations are in Spanish. They have been translated by a native speaking agent.
[2] The coordinators did not refer to JIMENEZ by name, but rather, stated they had a Border Patrol agent who could pass through loads of narcotics at the I-19 Checkpoint.

seven (7) kilograms of cocaine on Thursday (July 25, 2024). Person B said Person A would have to speak to the Border Patrol agent (JIMENEZ) and confirm moving the narcotics on Thursday, July 25, 2024

22.   On July 23, 2024, Person B engaged in a telephonic voice conversation over WhatsApp with the PNC. The PNC confirmed the smuggling event: "*Van a ser 7 quesitos, como te habia dicho.*" (English translation: "it will be seven (7) little cheeses [referring to cocaine] as I had told you.") Person B acknowledged and then provided details as to the method. S/he clarified with the PNC how the inspection lanes at the I-19 Checkpoint are numbered, and how JIMENEZ would advise which specific inspection lane the driver should use when transporting the anticipated cocaine load.

Additionally, Person B explained that BPAs were rotated throughout the day, but JIMENEZ could select which rotations he worked so he could be at the primary inspection area. Person B stated that JIMENEZ should be on primary at 4:00 p.m. and gave the vehicle transporting the cocaine a 15-minute window to be at the I-19 Checkpoint. Person B stressed that the vehicle could not arrive at the I-19 Checkpoint after 4:15 p.m. Person B further said that JIMENEZ had asked to be provided with the model and color of the vehicle transporting the cocaine. Additionally, the vehicle would need to have visible markers, such as a colored folder, placed on the vehicle's dashboard to assist JIMENEZ in recognizing the vehicle.

23.   On July 25, 2024, JIMENEZ would provide information regarding the activities at the I-19 Checkpoint and then later Person B would relay that information via WhatsApp call or message.

24.   At 6:50 p.m., on July 25, 2024, the agreed upon vehicle with a red folder in the dash, purportedly transporting seven kilograms of cocaine, passed through inspection lane 2 of the I-19 Checkpoint. JIMENEZ was working that inspection lane, and he waived through the vehicle without speaking to the driver or inspecting the vehicle. After the vehicle passed, JIMENEZ used his phone to confirm the passage of the vehicle to the coordinators. Person B shortly thereafter confirmed the passage to the PNC.

25. On July 26, 2024, $4,900 in currency, was delivered to an address in Nogales, Arizona, which is associated with Person B.

26. On August 13, 2024; September 5, 2024; September 17, 2024; and September 23, 2024, similarly coordinated vehicles were sent through the I-19 Checkpoint. JIMENEZ passed each one without inspection. Each load was coordinated through Person A and/or Person B using real time updates from the I-19 Checkpoint from JIMENEZ. Person A and/or B coordinated the receipt of payment for passing the purportedly loaded vehicle.

A TRUE BILL

/S/
FOREPERSON OF THE GRAND JURY
Date: December 3, 2024

GARY M. RESTAINO
United States Attorney
District of Arizona

/S/

GORDON E. DAVENPORT III
ANSHUL KRISHN
Assistant U.S. Attorneys